## SIMONTON *v.* SIBLEY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF NORTH CAROLINA.

Argued December 16, 1886. — Decided May 27, 1887.

By an agreement of partnership between A, B and C, A sold, for sums specified, to B one half, and to C one fourth, of his interest in certain bonds of a railroad corporation, secured by mortgage, retaining one fourth himself, and was to hold the bonds as collateral security for the payment of those sums; the whole amount of the bonds was to be held together, and neither partner was to sell or dispose of the whole or any part of his interest without the consent of the others; "but A shall have the privilege of selling the whole amount of bonds at his discretion at any time, and apply the proceeds to the 'payment of said sums due to him;" or A might, if he deemed best, foreclose the mortgage; and the proceeds of a foreclosure, "or, if the bonds are sold, the net proceeds of the sale, after paying the said sums of money and expenses of foreclosure, shall be considered as due to each party in proportion as the bonds are now held, but may be held by A as collateral security for the payment of the aforesaid sums respectively;" and special provisions were made for the application to the payment of certain small debts, and for the distribution among the partners, of "any profits arising from the sale, foreclosure, or any other disposition of said bonds." Upon a contract made by A for a sale of the bonds, which was not carried out, he received in part payment stock in another corporation; and he afterwards sold the bonds to another person for cash, retaining this stock. *Held*, that he was not bound, on receiving the stock, to apply it at once to the payment of the sums due him from his copartners, but might hold it as the property of all the partners under the partnership agreement.

THIS was a bill in equity by Hiram Sibley, a citizen of New York, and Paul P. Winston, assignee in bankruptcy of Lan-

caster, Brown & Co., and a citizen of Virginia, against the executrix of Robert F. Simonton, a citizen of North Carolina, for a settlement of the accounts of a partnership formed June 20, 1872, by Sibley, Simonton, and Lancaster, Brown & Co., for the purpose of speculating in certain railroad bonds and stock, as shown in the two following agreements signed by them:

"New York, June 19, 1872. This agreement between Hiram Sibley, of Rochester, R. F. Simonton, of North Carolina, and Lancaster, Brown & Co., of New York, witnesseth: That the said Sibley agrees to sell to the said Simonton one half interest in all his right and title to $1,057,000 of the first mortgage bonds of the Western North Carolina Railroad Company now held by him, ($500,000 of said bonds being signed by only one trustee,) and now in hands of Lancaster, Brown & Co. for safe keeping, and eight thousand one hundred and fifty-eight shares of stock in said company, for the sum of $135,633, payable on the 14th day of March, 1873, and the said Simonton agrees to buy the said interest and to pay as aforesaid; and the said Sibley also agrees to sell the said Lancaster, Brown & Co. one fourth of all his right and title to the said bonds and stock, for the sum of $67,817, payable on 14th March, 1873, and the said Lancaster, Brown & Co. agree to buy the same and to pay as aforesaid. It is expressly understood that the aforesaid bonds and stock sold each party are to be considered as held by Hiram Sibley as collateral security for the prompt payment of the said sums of money, and the whole amount of bonds and stocks shall be held together, and that neither party to this contract shall sell or in any way dispose of the whole or any part of his interest in the same, without the consent of all of the other parties. But Hiram Sibley shall have the privilege of selling the whole amount of both bonds and stock at his discretion at any time, and apply the proceeds to the payment of said sums due to him, allowing a rebate at the rate of seven per cent per annum if the payment shall be thus received before maturity. It is further agreed that Hiram Sibley may, if deemed best by him, proceed to foreclose the mortgage securing said bonds, and to

that end may employ counsel, the charge for which shall be borne by the parties in interest, in proportion to the amount of bonds and stock held by each; and whatever the proceeds of said foreclosure may be, or, if the bonds are sold, whatever the net proceeds of the sale may be, after paying the said sums of money and expenses of foreclosure, they shall be considered as due to each party in proportion as the bonds and stock are now held, but may be held by Hiram Sibley as collateral security for the payment of the aforesaid sums respectively.

"New York, June 20, 1872.  Mr. Hiram Sibley having this day sold to R. F. Simonton one half of his interest in $1,057,000 first mortgage bonds of the Western North Carolina Railroad Company, and eight thousand one hundred and fifty-eight shares of the stock of said company, and to Lancaster, Brown & Co. one fourth interest in said bonds and stock, he himself holding the remaining one fourth interest, it is mutually agreed between all the parties that from any profits arising from the sale, foreclosure, or any other disposition of said bonds and stock, $25,103.75 shall be first set apart to be divided in three equals parts, Hiram Sibley, R. F. Simonton, and Lancaster, Brown & Co. each to have one third; from any profits remaining there shall be first paid to Lancaster, Brown & Co. the commission by them for sale of bonds and tax, amounting to $1348.20, and to the Western North Carolina Railroad Company $881.27 due to said company; and any balance remaining shall be divided as follows: Hiram Sibley one fourth; R. F. Simonton one half; Lancaster, Brown & Co. one fourth.  In case of loss in this adventure, the amount due to Lancaster, Brown & Co. of $1348.20, and to the Western North Carolina Railroad Company of $881.27, shall be paid by each of the parties in proportion to their interest, and in the same proportion any deficiency that may exist in the proceeds, necessary to return to the said Hiram Sibley the sum of $271,266."

The other material facts, appearing by the master's report and the evidence taken in the case, were as follows:

Sibley brought a suit to foreclose the mortgage; and on

November 7, 1872, by contract in writing with one Wilson, agreed to sell him the aforesaid bonds and stock, and his interest in that suit, for the sum of $370,000, and acknowledged the receipt of $100,000 in part payment, but in fact received instead stock of the Southern Railway Security Company of this amount at its par value, which afterwards became worthless.

Sibley testified that he received this stock on the joint account of himself, Simonton, and Lancaster, Brown & Co. Lancaster, who had obtained his discharge in bankruptcy, testified that he knew and informed Simonton that this stock had been so received; and that Simonton was kept by him fully informed of all negotiations pending and concluded from time to time for the sale of the bonds and stock of the partnership, and personally approved of them.

On April 25, 1874, Simonton, in a letter to Lancaster, Brown & Co., spoke of the pending proceedings for foreclosure, and said, "The trade with Wilson was a bad one, but we must stick to it, as Mr. Sibley made it in good faith."

On October 3, 1874, Simonton and Lancaster, Brown & Co. signed and sent to Sibley this power of attorney:

"New York, October 3, 1874. Whereas we, the undersigned, in connection with Hiram Sibley, Esq., became the purchaser of $1,057,000 of the first mortgage bonds of the Western North Carolina Railroad Company; and whereas the said Sibley furnished nearly the whole amount of money paid for said bonds, and has not required us to pay him for our proportion of said cost, although the delay in realizing on said bonds has been much greater than was expected; and whereas, appreciating his liberality, and being anxious that he should recover his money thus invested in the shortest time possible, we have heretofore left to him the management of the adventure, we hereby authorize and request him to continue to direct the foreclosure proceedings against the said railroad company, or to take such other action, by sale of bonds or otherwise, as may in his judgment appear for the best interest of all concerned, hereby assuring him that whatever course he may deem best will be satisfactory to us."

· On October 27, 1874, Wilson having failed to carry out his contract by paying the rest of the consideration, Sibley sold the aforesaid bonds and stock of the Western North Carolina Railroad Company, subject to any claim of Wilson, to one Matthews for $270,000 paid in cash, with a stipulation that Sibley in any event should retain the $100,000 received by him from Wilson in stock of the Southern Railway Security Company.

On October 31, 1874, Sibley received on this stock a stock dividend of fifty per cent and a cash dividend of $3500.

On December 24, 1874, Lancaster wrote a letter to Simonton, which was received, in which he said: "Mr. Sibley sold out to Mr. Matthews for $270,000, but in order to induce him to purchase had to lend him $200,000. We enclose a statement showing figures, as near as we can give them, of your indebtedness to Mr. Sibley and to ourselves, growing out of that transaction. To Mr. Sibley you will owe $14,364; to us $1292.46. And Mr. Sibley will have to transfer to you, upon the payment of the aggregate amount, say $15,656.46, $75,000 of Southern Railway Security stock. That amount of that stock cannot be sold now to realize as much as $15,000, but it is said that it is intrinsically worth 25 cents in the dollar. We have written Mr. Sibley to send us his account against you, which I will send you as soon as received, but I don't think it will vary materially from that which I enclose."

In the statement enclosed, the amount due from Simonton to Sibley was made up by charging Simonton with the sum of $135,633, which he had agreed to pay Sibley by the agreement of partnership, and interest from March 14, 1873, to October 31, 1874, and crediting him as of the latter date with $135,000, half the proceeds of the sale to Matthews, and with half the cash dividend of $3500 received by Sibley.

Lancaster testified that this statement was correct; and that Simonton made no objection to it in a conversation which they afterwards had in reference to the state of accounts between the parties to the adventure.

On February 23, 1875, Sibley drew up and sent to Simonton an account like that sent by Lancaster, Brown & Co., except in

crediting Simonton with half of the interest from March 14. 1873, to October 31, 1874, on the cash dividend, and charging him with half of certain expenses, thereby reducing the balance to $14,252.94.

On December 17, 1875, Lancaster wrote to Simonton, saying: "Mr. Sibley is here, and seems very much annoyed at not hearing from you in regard to your indebtedness to him growing out of that Western North Carolina Railroad bond transaction. He says he is not inclined to give you trouble, and is willing to make a liberal settlement, but a settlement he must insist on, and hopes you will not force him to bring suit against you."

On January 10, 1876, Simonton replied: "Your letter, with Mr. Sibley's request, received. I have been an invalid all last year, and Col. Tate has all my papers, and promised me to go to New York, see you and Mr. Sibley, and make a settlement. He has not done so. I have forwarded your letter to him. I hope he will attend to this case. There is no use of a suit; all can be settled without."

Simonton died in 1876, and this bill was filed March 5, 1877.

The account rendered by Sibley to Simonton as aforesaid was adopted by the master as the true statement of accounts between them.

The defendant excepted to the master's report, "in that he did not charge the complainant, Hiram Sibley, with $100,000 of Southern Railway Security stock, with interest at seven per cent, which the evidence shows the said Sibley received as cash at par value."

The Circuit Court overruled this exception and confirmed the master's report, and afterwards, upon the report of a special master showing that Simonton's estate was insolvent, entered a final decree in favor of Sibley for the sum of $5191.35. The defendant appealed to this court.

*Mr. Samuel Field Phillips* for appellant.

If it is thought that a case is made for a general account, it is submitted that it should be taken upon the footing of the

sale of November 7, 1872; Sibley to be allowed, perhaps, in place of the $270,000 remaining due thereupon from Wilson, with interest from that day, the $270,000, instead, which he received from Matthews upon the 31st October, 1874, *i.e.* a loss of interest for more than 31 months.

The agreement between Sibley, Simonton and Lancaster, Brown & Co. of June 19, 1872, shows that Sibley retained the stock and bonds as collateral security for the price at which he sold interests therein to other parties; that neither of the parties were to sell such bonds and stock, or any part thereof, without the consent of the other:

"But Hiram Sibley shall have the privilege of selling the whole amount of both bonds and stock at his discretion at any time, and apply [*not* apply*ing*] the proceeds to the payment of said sums due to him, allowing a rebate at the rate of seven per cent per annum if the payment shall be thus received before maturity. It is further agreed that Hiram Sibley may, if deemed best by him, proceed to foreclose the mortgage securing said bonds, and to that end may employ counsel, the charge for which shall be borne by the parties in interest, in proportion to the amount of bonds and stock held by each; and whatever the proceeds of said foreclosure may be, or, if the bonds are sold, whatever the net proceeds of the sale may be, after paying the said sums of money and expenses of foreclosure, they shall be considered as due to each party in proportion as the bonds and stock are now held, but may be held by Hiram Sibley as collateral security for the payment of the aforesaid sums respectively."

By "the said sums of money" in the above passage is meant the sums due by Simonton and Lancaster, Brown & Co., for, as will appear by a former part of the agreement, that very expression is used in reference to these debts just after their specification. This remark may be *ex abundanti*, as the fact appears plain even without such context.

It is submitted that Sibley was to sell at any time (whether before or after these debts became payable) — "at any time," that is, before or after March 14, 1873 — and that having perfect discretion as to the sale, he was bound to apply the pro-

ceeds to his debt, so far as needed, and the balance amongst the parties in proportion. As already intimated, the word "apply," in the agreement of June 19, 1872, is to be referred to the word "shall" in the first line ("shall have, &c., and [shall] apply"); whilst, if the writers had intended to connect it with the word "privilege," in the second line, they would have made it "applying."

He did sell, but after holding certain proceeds for more than two years he asserts an option to turn these over to the firm, and without more said to require his partners or debtors to make good to him any loss that his holding of them might have occasioned. By what authority is this done?

The agreement of 19th June, 1872, (the only material one upon Sibley's theory of a loss by him, — as that of the 20th is important only in case the adventure turned out to be profitable,) creates a partnership in a property already held as collateral — a partnership, that is, in an anticipated profit after a creditor, (Sibley,) who was also to be a partner, should have been satisfied. In the meantime that creditor-partner was to hold the property, with privilege to sell, and duty thereupon to pay himself. If he should sell, the partnership had no power to control the proceeds before the satisfaction of his debt, and even he had no power over them as partner. The agreement is that the proceeds of any sale be applied to the debt.

It is submitted that Sibley sold in his character as creditor. That character was the ground of his authority, and the papers which he executed are to the same effect. They witness sales by "Hiram Sibley," and do not purport to be in behalf of a partnership, or even allude to one.

It is now submitted, for Simonton, that the account which Sibley demands by his bill, required him to credit the adventure, on account of the sale of the bonds and the stock, with $97,500, as received by him November 7, 1872.

*Mr. William E. Earle* for appellee.

MR. JUSTICE GRAY, after stating the case as above reported, delivered the opinion of the court

The object of this bill is the settlement of the accounts of a partnership, the members of which were Sibley, Simonton, and the firm of Lancaster, Brown & Co.

By the original agreement in writing, dated June 19, 1872, which took the place of articles of partnership, the partnership property was to consist of a large quantity of bonds and stock of the Western North Carolina Railroad Company, previously held by Sibley; Simonton bought one half of Sibley's interest therein for the sum of $135,633, and Lancaster, Brown & Co. bought one fourth of Sibley's interest for $67,817; Sibley was to hold the same as collateral security for the payment to him of those sums; the whole amount of the bonds and stock was to be held together, and neither partner was to sell or dispose of the whole or any part of his interest without the consent of his copartners; but there were provisions authorizing Sibley to sell the whole property of the partnership, which will be considered presently.

Early in November, 1872, Sibley made a contract with Wilson to sell him the Western North Carolina Railroad bonds and stock, belonging to the partnership, for $100,000 in stock of the Southern Railway Security Company, which Wilson transferred to him, and $270,000 in cash, which Wilson did not pay; and in the latter part of October, 1874, Sibley sold the Western North Carolina Railroad bonds and stock to Matthews for the like sum of $270,000 paid in cash, with a stipulation that Sibley should retain the $100,000 of Southern Railway Security stock that he had received from Wilson. Sibley never received any money from this stock, except one cash dividend of $3500.

The master has treated this stock as partnership property, and has charged Simonton's estate with his aforesaid debt to Sibley of $135,633, and interest, and credited him with $136,750, half of the sums received by Sibley in cash as aforesaid, showing, with the interest and expense account, a balance due Sibley of something more than $14,000.

The argument of the appellant, that Sibley should have been charged with the $100,000 of stock of the Southern Railway Security Company at its par value, is based upon the

theory that Sibley, in selling the partnership property, acted, and was authorized to act, only as a creditor of his copartners, and not as a partner on behalf of the partnership.

It cannot be denied that some of the provisions of the original agreement of partnership are consistent with this theory.

The agreement provides that Sibley " shall have the privilege of selling the whole amount of both. bonds and stock at his discretion at any time, and apply the proceeds to the payment of the said sums due to him." If this were all, there might be some difficulty in construing Sibley's authority to sell as absolute and unqualified; and his " privilege of selling" might perhaps be considered as so coupled with a duty to " apply the proceeds" of any sale " to the payment of the said sums due to him," that he would be bound, if he sold the property, to apply the proceeds at once to the payment of those sums.

The agreement of June 19 next provides that Sibley may, if he thinks best, proceed to foreclose the mortgage by which the bonds were secured, " and whatever the proceeds of said foreclosure may be, or, if the bonds are sold, whatever the net proceeds of the sale may be, after paying the said sums of money and expenses of foreclosure, they shall be considered as due to each party in proportion as the bonds and stock are now held." This provision, again, if it had stopped here, might possibly have been understood as intended only to affirm the right of the partners to share, according to their respective interests, in the proceeds of either a foreclosure or a sale — the debt to Sibley, as well as the incidental expenses, being first paid out of those proceeds.

But this provision goes on and ends with these words: " but may be held by Hiram Sibley as collateral security for the payment of the aforesaid sums respectively." This clause, taken in connection with what goes before, cannot possibly mean that it is only the net proceeds, after deducting out of them the sums due to Sibley from his copartners, together with the incidental expenses, in the event of a foreclosure, or after deducting the sums due him from his copartners in the

event of a sale, that are to be held by him "as collateral security for the payment of the aforesaid sums respectively;" for, after an application of the proceeds of a sale to the payment of those sums, either those sums would have been wholly paid if the proceeds were sufficient to pay them, or, if they were insufficient, no proceeds would remain to be held as collateral security. The only reasonable construction of the clause is, that Sibley, instead of immediately applying the proceeds, either of a sale or of a foreclosure, to the payment of the debts of his copartners to himself, may hold the whole proceeds, just as he previously held the bonds and stock, as collateral security for the payment of those debts, leaving the title to the proceeds after the sale or foreclosure, as the title to the bonds and stock was before, in the partners respectively, in the proportions determined by the partnership agreement.

The supplemental agreement of June 20, 1872, also, making special provisions for the distribution of "any profits arising from the sale, foreclosure, or any other disposition of said bonds," clearly implies, by the use of the word "profits," that any sale by Sibley might be made by him as a partner on behalf of the partnership, and not merely as a creditor enforcing his collateral security.

The view that the partnership agreement empowered Sibley to sell the property as managing partner, independently of his right as a creditor, is confirmed by the terms of the power of attorney given him by his copartners on October 3, 1874, by which they recited that they had "heretofore left to him the management of the adventure," and authorized and requested him, either to prosecute the proceedings for foreclosure, "or to take such other action, by sale of bonds or otherwise, as may in his judgment appear for the best interest of all concerned."

The Southern Railway Security Company stock is now worthless; and it is not proved, nor even contended, that Sibley neglected any opportunity of selling it and turning it into money. The only exception to the master's report, relied on at the argument, was that the master had not charged

Sibley with this stock at its par value, and interest. Upon the true construction of the partnership agreement, and the proofs in the case, this exception was rightly overruled by the Circuit Court, because this stock was never received by Sibley as cash, or accepted by him as his own property in part payment of the sums due him from the other partners, but was received and afterwards held by him as property of the partnership, belonging to all the partners in the proportions stipulated in the original agreement.

The further objection has been taken for the first time in this court, that the bill cannot be maintained, because the evidence shows an account stated between Sibley and Simonton, on which an action at law would lie. It is a sufficient answer to this objection, that the evidence does not show, and the master has not found, that an account was rendered by the one party and assented to by the other, but only that Sibley rendered to Simonton a statement of the account between them, which was not treated by either as an account stated, nor ever agreed to or settled, but remained open at the death of Simonton, and until its truth was established by the evidence in this suit against his executrix to settle the accounts of the partnership.

*Decree affirmed.*